# EXHIBIT A

Patrick Wallen, Esq.
SBN: 297707
Wallen Law PC
62 Plata Ct
Novato CA 94947
415 827-4867
patrick@wallenlawpc.com

Attorney for Plaintiff Mark Swendsen

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
08/03/2026
Clerk of the Court
BY: DAEJA ROGERS
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN FRANCISCO**

MARK SWENDSEN,

Plaintiff,

vs.

COLOSSAL BIOSCIENCES, INC.,

Defendant.

Case No. _______ CGC-26-639525

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## I. INTRODUCTION

1. This action arises from Defendant's selective and bad faith interference with Plaintiff's ability to complete a secondary transaction involving his equity.
2. Defendant silently amended its Bylaws purporting to impose a restriction on some, but not all, of the common shareholders, including restricting Plaintiff. Defendant did not

notify rank and file staff of the amendment, nor did it provide advance notice to those who held vested options and could have easily avoided the application of the restriction.

3. The restriction has the effect of stripping the stock of its value for the foreseeable future. Prior to the amendment, the shares were freely marketable subject to applicable laws.
4. Unaware that the Defendant has changed the terms of the shares for some but not all of the holders, Plaintiff identified a willing third-party buyer and initiated a transfer at approximately $20 per share, representing a transaction value materially above Defendant's current fair market value as of the date of this filing.
5. Defendant blocked Plaintiff's transaction.
6. Upon information and belief, at or around the same time, Defendant permitted the same buyer to acquire shares from a different shareholder at the noticed price.
7. Upon information and belief, the seller who sold to the same Buyer was subject to effectively the same transfer restrictions.
8. Defendant has represented that its transfer restrictions were applied consistently across shareholders; this is not true.
9. Instead, Defendant blocked Plaintiff's transfer while, upon information and belief, permitting a favored shareholder—one whose privileged standing derived from its relationship with management—to sell to the very same buyer the shares Plaintiff had arranged to sell, effectively diverting Plaintiff's transaction to that favored seller.
10. Defendant's conduct was not a neutral application of policy. It was a selective intervention that disrupted a known economic relationship, undermined a Californian citizen's property rights, and caused substantial harm.

## II. PARTIES

11. Plaintiff Mark Swendsen is an individual residing in California.

12. Defendant Colossal Biosciences Inc. ("Company," or “Defendant”) is a Delaware corporation doing business in California with its principal place of business in California.

## III. JURISDICTION AND VENUE

13. Jurisdiction is proper in California because the conduct at issue was directed toward a California resident and caused harm in California.

14. Venue is proper because a substantial portion of the events giving rise to this action occurred in this County, and the independent contractor agreement was performed, in substantial part, in this County, and contains no forum-selection clause designating any other venue.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Equity and Proposed Transaction

15. Plaintiff was granted stock options in Colossal Biosciences Inc. in May 2022 in connection with his provision of services to Defendant, including an option grant identified as ES-92, which entitled Plaintiff to acquire shares of Defendant's common stock subject to Defendant's equity plan, vesting schedule, and related requirements.

16. Plaintiff accepted such equity grant with the understanding that, once vested, the options could be exercised and thereafter monetized through a sale of his shares.

17. Central to Plaintiff's decision to provide (and continue providing) services to Defendant was the prospect of earning valuable equity. Plaintiff was informed by recruiters and key stakeholders that work for Defendant that his equity grant would be valuable.

18. At the time the options were granted and throughout the substantial majority of the period during which they vested, no bylaw provision or company policy required Plaintiff to obtain Defendant's consent to transfer shares acquired upon exercise.

19. In reliance on the existing transfer framework, Plaintiff elected not to exercise his vested options immediately, understanding that he could do so at a time of his choosing without forfeiting the ability to sell the resulting shares in a secondary transaction.

20. In connection with a company restructuring, employees of Colossal Biosciences Inc. transitioned to an employment relationship with its affiliate, Form Bio LLC, ending the employment relationship with Colossal Biosciences Inc.

21. Contemporaneously, Plaintiff entered into an independent contractor agreement with Colossal Biosciences Inc., pursuant to which he continued to hold service provider status and, among other things, preserved the vesting of his option grant ES-92.

22. The commencement of the independent contractor relationship had the effect, by operation of law, of fundamentally changing the nature of Plaintiff's options: because incentive stock option (ISO) treatment requires that the holder be an employee, Plaintiff's transition from employee to independent contractor converted his options from incentive stock options (ISOs) to nonqualified stock options (NSOs).

23. At all times relevant to the conduct alleged herein, including Defendant's November 2024 amendment of its bylaws and its concealment of that amendment, Plaintiff's

relationship with Colossal Biosciences Inc. was that of an independent contractor governed by the independent contractor agreement described above.

24. Approximately sixteen days following the commencement of the employment relationship, it was terminated, and the relationship between the parties became that of a independent contractor.

25. As a result, of the approximately three-and-one-half years that Plaintiff provided services to Defendant and earned and vested the equity at issue, Plaintiff was a direct employee of Defendant for only approximately the first sixteen days, roughly one percent of that period, and he served Defendant as an independent contractor for the remaining approximately ninety-nine percent, including at all times material to the November 2024 bylaw amendment, the blocked October 2025 transfer, and the communications that followed.

26. During this time, Defendant again relayed to Plaintiff that the value of his equity would be important to his financial future. The aforementioned company restructuring was framed to staff as a pathway to earn equity in two companies, the Defendant and its affiliate.

27. During his tenure, including after the vesting of some of Plaintiff's options, Plaintiff had actual knowledge of share resales, which, bolstered by Defendant's representations about the value of its equity, reinforced the proposition that his shares would be marketable.

**B. Defendant Illegitimate Block of Plaintiff's Sale of Shares**

28. In November of 2024, Colossal Biosciences Inc. quietly amended its bylaws to prohibit the secondary sale of any shares not yet exercised as of the date of the bylaws

amendment, effectively creating a new restriction that operated to foreclose Plaintiff's ability to participate in secondary transactions involving his equity without the Company's consent. This is commonly referred to as a "block" or "veto."

29. The restriction was unusual. It purported to affect some of the common shares, but not others. The restriction was designed only to affect shares acquired after the amendment, effectively creating two tranches of common shares, those subject to the restriction and those that are freely transferable.

30. This is unusual in the sense that private companies ordinarily approve documentation that purports to restrict all common shares, regardless of when they were acquired, and thereafter seek assent from the existing shareholders to the new restriction, which has a binding effect. Instead, Defendant gave a free pass to current holders, which include, information and belief, company management and founders- insiders of Defendant who control the company and who are responsible for passing the restriction.

31. No advance notice of the amendment was provided to optionholders, including Plaintiff, who at the time of the amendment held vested options and could have exercised those options prior to the amendment had he been aware of the pending imposition of the restriction. If timely exercised, Plaintiff would have preserved his ability to sell his shares without the requirement to obtain company consent.

32. In other words, Defendant secretly passed a restriction without any advance notice to those it induced to work for it (and continue to work for it), which effectively targeted only rank and file service providers who did not have insider knowledge of the pending restriction, as the management had. The restriction and the implementation process was

structured to harm some stakeholders (like Plaintiff Mark Swendsen) but not others (like insider management).

33. In or about October 2025, Plaintiff identified a third-party buyer willing to purchase Plaintiff's shares at a price of approximately $20 per share, and Plaintiff, unaware of the newly enacted bylaws amendment, delivered a transfer notice to Defendant reflecting a proposed secondary transaction structured as a “cashless exercise and sale”, in which a third-party purchaser (the "Buyer") funds the exercise costs to the company in connection with a contemporaneous sale of the corresponding shares from the seller to the buyer. The exercise costs go to the company and the remaining portion of the purchase price goes to the company.

34. A “cashless exercise and sale” is commonplace in the private secondary market for stock sales. It is often used by sellers when their exercise costs are significant.

35. Plaintiff delivered a transfer notice to the company that contained all the relevant data about the pending sale, including the price of the stock and the name of the buyer.

36. Following Plaintiff's delivery of the transfer notice, Defendant did not engage in any case-specific evaluation of the proposed transaction, nor did Defendant request additional information regarding the Buyer, the structure, or compliance with applicable transfer mechanics. Defendant made no inquiry to Plaintiff.

37. Instead, Defendant communicated a categorical position that, *even if Plaintiff were to exercise the options*, any resulting shares would remain subject to transfer restrictions (including the restriction, the new bylaws amendment) that would prevent any secondary transaction absent the company's consent. Defendant stated unambiguously that such

consent would be withheld until an IPO or other liquidity event. Put simply, Defendant blocked the sale.

38. Defendant did not indicate that such restrictions were transaction-specific or dependent on the identity of the Buyer, the type of shares, or any other individualized factors. The communication conveyed only a blanket prohibition on secondary transfers with no articulated exceptions.

39. As a result of Defendant's position, Plaintiff was unable to proceed with the proposed transaction and lost the opportunity to consummate a sale at approximately $20 per share, which represents a substantial premium to Defendant's current valuation as of the date of this complaint.

40. At this juncture, Plaintiff was not aware that Defendant had directly or indirectly taken the contents of Plaintiff's transfer notice, including the name of the buyer and the sale price, and handed it off to another shareholder -on information and belief.

41. On September 20, 2025, Plaintiff entered into a Separation and Transition Agreement with Form Bio LLC, that, among other things, contemplated the termination of Plaintiff's employment with Form Bio LLC to take effect in December of 2025. The termination of his employment with Form Bio LLC had the effect of terminating the vesting of his options with Colossal Biosciences Inc. pursuant to Plaintiff's advisory agreement.

42. Plaintiff subsequently exercised a portion of his options on or about January 22, 2026, thereby acquiring shares of Defendant's common stock. Plaintiff exercised the remainder of his options in March of 2026.

**C. Redirection of Plaintiff's Transaction to a Favored Shareholder Under Identical Conditions**

43. Upon information and belief, and unbeknownst to Plaintiff, after blocking Plaintiff's proposed sale of his equity, Defendant Colossal Biosciences Inc. introduced the Buyer in Plaintiff's transfer notice to a different shareholder- a preferred shareholder.

44. In private companies that receive venture funding, owners are often in two categories, common shareholders (e.g. founders, advisors, and insiders) and preferred shareholders (e.g. investors) that host "preferred" terms, including how cash is distributed when the company is sold. The term "preferred" does not convey that other classes are a subclass in a lowly and relegated position. It does not mean that the law imposes special duties on managers for the benefit of the preferred holders. And it does not mean that common shareholders cannot avail themselves of the fiduciary duties that managers owe owners. Common shareholders are not a subspecies of owners.

45. Nevertheless, after blocking Plaintiff's proposed sale, Defendant took the information in the transfer notice and used it to facilitate a sale of company shares under the same price per share set forth in the transfer notice originally provided to the Company by Plaintiff.

46. On information and belief, Defendant blocked Plaintiff's transaction while permitting the same Buyer to acquire a significantly greater number of shares from a favored holder at the same price per share set forth in Plaintiff's noticed transaction.

47. Plaintiff eventually learned that, notwithstanding Defendant's categorical position at the time of Plaintiff's transfer notice that the Company would not permit a sale of shares subject to a consent requirement, the Buyer was permitted to acquire shares from another shareholder in a separate transaction involving a preferred shareholder.

48. On information and belief, the selling preferred shareholder was also subject to a company-imposed consent requirement. Defendant apparently had the right to block the sale of the preferred shares to the same Buyer, as it purported to do for Plaintiff. For the avoidance of doubt, both Plaintiff and the selling shareholder were required to obtain Company consent to conduct a transfer. Functionally, there is no difference in the transfer restrictions imposed on Plaintiff's shares, with those imposed upon the restrictions of the selling shareholder.

49. Defendant nevertheless approved and facilitated that transaction while denying Plaintiff the same opportunity under materially indistinguishable conditions. In sum, Defendant discriminated against Plaintiff.

50. Defendant's refusal to permit Plaintiff's transaction, coupled with its approval or facilitation of the Buyer's acquisition from another shareholder subject to the same consent regime, operated to redirect that transaction away from Plaintiff and toward a preferred shareholder apparently holding a “preferential” or “privileged” status with the company, signaling that common shareholders like Plaintiff are a disfavored subclass whose property rights are somehow entitled to less protection and deference than those of preferred holders. The law does not abide such a view.

**D. After-the-Fact Explanations That Bear No Logical Nexus to the Facts and Reveal Pretext and Selective Enforcement**

51. Upon learning of this discrimination and disparate treatment, Plaintiff secured counsel and caused a written dialogue to commence with the company and its representatives.

52. Defendant, through counsel on March 10, 2026, further asserted that it "fully complies with and consistently applies its stock transfer restrictions," while simultaneously stating that such restrictions "vary depending on the particular circumstances of each stockholder, including the types of shares that are held."

53. Further, in its March 10th email, Defendant, through counsel, stated that the seller's shares are "…not bound by the same transfer restrictions as the shares held by your client."

54. Later, on April 6th, Defendant, through counsel, conceded, "While the shares of the Company's preferred stock *are subject to contractual restrictions on transfer and ownership* [emphasis added], those restrictions were not applicable to the transaction you reference." Defendant attempted to distinguish the transaction by asserting that it involved preferred stock rather than common stock, reaffirming its view that Defendant disfavors common shareholders.

55. Defendant's explanations shifted as the inconsistency in its conduct became apparent. It first asserted that the transfer restrictions were applied uniformly, but later recast that assertion to apply only to common stock under the bylaws, thereby excluding preferred stock transactions from the scope of its claimed uniformity.

56. This narrowing of its position arose only after the inconsistency between Defendant's stated rationale and its conduct became apparent.

57. Defendant did not disclose any such distinction, limitation, or exception at the time it refused Plaintiff's proposed transaction in October 2025, nor did it indicate that transfer restrictions would be applied differently based on share class or the identity of the selling

shareholder, despite the fact that both Plaintiff and the selling shareholder were each subject to a consent obligation that are functionally the same.

58. Defendant's conduct demonstrates that its stated transfer restrictions were not applied uniformly, but instead were enforced selectively in a manner that deprived Plaintiff of a specific, identified transaction while permitting that same transaction to proceed for another selling shareholder that held favor with the company.

59. In a written communication dated March 24, 2026, Defendant, through counsel, asserted a host of explanations attempting to justify this discriminatory conduct, including that Plaintiff's proposed transaction raised concerns regarding stockholder caps and potential registration thresholds. Defendant reiterated those concerns in subsequent communications dated April 6, 2026. In none of these communications did Defendant identify how Plaintiff's proposed transaction, which involved a single, identified buyer in a discrete secondary transfer, would implicate any such cap or threshold, nor did Defendant explain why those concerns would not apply equally to the transaction Defendant permitted involving Buyer.

60. Additionally, in communications dated March 24, Defendant asserted that Plaintiff's proposed transfer was denied, in part, to prevent a party who was not an employee from acquiring shares, which in such correspondence was characterized by Plaintiff's counsel to be an "undesirable" transferee. Notwithstanding that position, Defendant permitted that same purchaser, the Buyer, to acquire shares from another stockholder, thereby allowing the purportedly undesirable transferee onto the company's cap table. Defendant did not identify any basis on which the purchaser was undesirable, nor did it reconcile its stated

rationale with its decision to facilitate that transaction and permit the transferee to join the cap table, despite not being an employee or service provider of the company.

61. In the April 6, 2026 communication, Defendant also referenced internal valuation considerations, including compliance with its 409A valuation. Defendant repeated this rationale in later communications. Across these communications, Defendant did not explain how a private secondary transaction between Plaintiff and Buyer would impact its internal valuation framework, nor did Defendant reconcile that position with its decision to permit a materially similar transaction involving Buyer at the same price. Indeed, Defendant did not explain how a larger transaction and larger deal with the same Buyer, at the same price per share, would burden its 409A valuation framework any less than Plaintiff's smaller proposed transfer. If anything, the greater size of the permitted transaction undermines that rationale rather than supporting it.

62. On April 6, Defendant, through counsel, asserted that the transfer restrictions "accomplish this goal by limiting the number of secondary sales in the Company's common stock." Defendant offered no explanation for how that rationale could be squared with its decision to permit a separate transaction that resulted in an additional secondary sale, directly undermining its stated objective.

63. To summarize, Defendant has advanced a series of shifting rationales that bear no logical nexus to the facts presented here. If these arguments reflect the Defendant's actual policies governing secondary sales, then those policies were applied to Plaintiff but not to the similarly situated shareholder whose transaction Defendant approved at the same price and on the same terms.

64. Defendant afforded preferential and favorable treatment to another shareholder in connection with a materially similar transaction, while treating Plaintiff less favorably and denying him the same opportunity under the same purported transfer restrictions.

65. The absence of any coherent explanation logically connected to the underlying facts demonstrates that Defendant's stated rationales are pretextual and not grounded in any legitimate or consistently applied business justification.

**E. Economic Harm and Loss of Liquidity Resulting from Defendant's Conduct**

66. Defendant's conduct operated to disadvantage Plaintiff relative to a similarly situated shareholder, effectively depriving Plaintiff of the opportunity to realize the economic value of his shares and interfering with his property rights.

67. Since blocking Plaintiff's deal and permitting the Buyer to purchase from another seller, the market for Colossal Biosciences Inc. shares has not recovered.

68. As a direct and proximate result of Defendant's conduct, Plaintiff lost the opportunity to complete a transaction at approximately $20 per share, representing an aggregate loss of approximately $1,000,000 for the transaction at issue.

69. Further, Plaintiff would have included the remainder of his shares in a similar transaction at approximately $20 per share, resulting in additional lost proceeds of approximately $10,300,000.

70. Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to lost profits, lost liquidity, and the diminished value of his equity.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

71. Plaintiff incorporates all prior allegations.

72. Plaintiff had an existing economic relationship with a third-party buyer.

73. Defendant knew of this relationship.

74. Defendant intentionally acted to disrupt the relationship by blocking the transaction. By enforcing the November 2024 transfer restriction against Plaintiff while permitting a materially identical transfer involving the same buyer to proceed for a favored holder, Defendant knew that disruption of Plaintiff's pending transaction was substantially certain to occur, or acted with that intent.

75. Defendant's conduct was wrongful by some measure beyond the interference itself. The selective imposition and enforcement of the transfer restriction was independently wrongful because it breached the implied covenant of good faith and fair dealing and constituted an unlawful, unfair, and fraudulent business practice under Business and Professions Code section 17200, and it was further reinforced by Defendant's representations to Plaintiff regarding the marketability of his equity, on which the claim does not depend.

76. The relationship was disrupted.

77. Plaintiff suffered damages.

## SECOND CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

78. Plaintiff incorporates all prior allegations.

79. In the alternative, Defendant failed to act with reasonable care in applying its policies.

80. Defendant's inconsistent and opaque conduct foreseeably disrupted Plaintiff's transaction.

81. Plaintiff suffered damages.

**THIRD CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

82. Plaintiff incorporates all prior allegations.

83. Plaintiff and Defendant were parties to agreements governing Plaintiff's equity.

84. Those agreements conferred discretion on Defendant regarding transfer restrictions.

85. Defendant was obligated to exercise that discretion in good faith.

86. Defendant breached that obligation by applying restrictions selectively, treating similarly situated parties differently, and undermining Plaintiff's ability to realize the benefit of his equity.

87. Plaintiff suffered damages.

**FOURTH CAUSE OF ACTION**

**Unfair Competition (Bus. & Prof. Code § 17200)**

88. Plaintiff incorporates all prior allegations.

89. Defendant engaged in unlawful, unfair, and fraudulent business practices, including selective enforcement of transfer restrictions, misrepresentation of policy application, and interference with economic relationships.

90. Plaintiff seeks restitution and injunctive relief.

**FIFTH CAUSE OF ACTION**

**Intentional Misrepresentation**

91. Plaintiff incorporates all prior allegations.

92. Defendant represented to Plaintiff that the equity granted for his serviceshad real and marketable value, and that such equity could be monetized through secondary transactions, thereby inducing Plaintiff to provide his services in exchange for, among other things, that equity.

93. Beyond these specific representations, Defendant actively cultivated hype around the value and marketability of its shares, including in connection with the company restructuring, which it framed to staff as a pathway to earn equity in two companies, thereby reinforcing the perceived worth of Plaintiff's equity and further encouraging Plaintiff to remain with and continue providing services to Defendant.

94. Those representations were false or became false when Defendant surreptitiously amended its bylaws to eliminate the marketability of Plaintiff's equity without notice, effectively destroying the value Defendant had represented the equity would carry.

95. Defendant knew the representations were false or misleading at the time they were made, or acted recklessly in making them, including by failing to disclose the pending or contemplated restriction on secondary transfers.

96. Plaintiff reasonably relied on Defendant's representations regarding the nature and value of his equity in deciding to accept and continue providing services in exchange for that equity. In further reliance on those representations and on the existing transfer framework, Plaintiff elected not to exercise his vested options at an earlier date, understanding that no consent requirement or transfer restriction would impair his ability to monetize the resulting shares.

97. Had Plaintiff known that Defendant would surreptitiously impose restrictions eliminating the marketability of his equity, Plaintiff would have exercised his options before such restrictions took effect.

98. As a direct and proximate result of Defendant's misrepresentations, Plaintiff suffered damages, including the loss of the ability to monetize his equity at its represented value.

**SIXTH CAUSE OF ACTION**

**Negligent Misrepresentation**

99. Plaintiff incorporates all prior allegations.

100. In the alternative, Defendant made representations regarding the nature, value, and marketability of Plaintiff's equity without reasonable grounds for believing them to be true, or failed to disclose material changes to the conditions governing that equity that rendered those representations misleading.

101. Plaintiff reasonably relied on those representations in continuing to provide services as an independent contractor and in forgoing other opportunities to exercise or monetize his equity.

102. As a direct and proximate result, Plaintiff suffered damages.

SEVENTH CAUSE OF ACTION

**Fraudulent Concealment / Failure to Disclose (Duty Arising by Operation of Law)**

103. Plaintiff incorporates all prior allegations.

104. This claim arose by operation of law from the parties' relationship and the disparity of information between them. Defendant and Plaintiff were parties to a contractual and service relationship governing Plaintiff's equity, and Defendant, as the issuer that drafted, adopted, and controlled the timing of the bylaw amendment, had

exclusive and superior knowledge of material facts that Plaintiff could not have known or reasonably discovered throughout his contractual relationship with Defendant.

105. Specifically, Defendant alone knew that it had adopted, or was about to adopt, the November 2024 bylaw amendment imposing a new consent requirement on common shares acquired upon exercise after that date, while leaving shares already held—including those of insiders and management—unrestricted. That information was material because it directly determined whether, and on what terms, Plaintiff could monetize the equity for which he had provided his services.

106. The duty to disclose arose from multiple independent sources. It arose first from Defendant's exclusive possession and control of the operative information: Defendant alone knew of the pending bylaw amendment, the temporal limitations it would impose, and their practical effect on the transferability, liquidity, and marketability of the shares into which Plaintiff's vested options could convert, and Plaintiff had no reasonable means of discovering those facts independently. The duty arose independently from the parties' contractual and service relationship: a principal may not induce a service provider to render or continue services through concealment of material facts bearing on the compensation for those services, and Defendant induced Plaintiff to accept and continue providing services in exchange for equity compensation whose transferability and liquidity Defendant alone controlled, while altering the terms of that compensation without notice and continuing to benefit from Plaintiff's services. Because that information directly bore on Plaintiff's decisions to continue providing services to Defendant, to participate in the restructuring, and whether and when to exercise his vested options, Defendant was bound to disclose the pending or enacted restriction to

Plaintiff before he acted in reliance on the pre-existing transfer framework. Defendant's silence constituted suppression of a material fact by a party bound to disclose it, actionable as deceit under California Civil Code sections 1709 and 1710. Independently, Defendant made partial representations while suppressing material facts: it continued to represent to Plaintiff that his equity was valuable and marketable while concealing the pending or enacted amendment that would impair that very marketability, rendering those representations misleading and itself giving rise to a duty to disclose the suppressed facts.

107. Defendant's concealment is further confirmed by the limited and selective nature of the restriction itself. A restriction that is secretly imposed on uninformed optionholders, exempts the very insiders who adopted it, and is then enforced selectively against one shareholder while a materially identical transfer is permitted for a favored holder bears the hallmarks of deliberate concealment rather than neutral policy. The secrecy was not incidental; it was the mechanism by which Defendant kept Plaintiff from learning facts that would have prompted him to act before the restriction could be used against him.

108. The amended 2024 Bylaws restricted only common shares acquired under the option plan after November 2024 subject to limited exceptions, confirming both the materiality of the concealed facts and the asymmetry of information between the parties.

109. Defendant concealed these facts with the intent that Plaintiff continue to forbear from exercising his vested options and continue providing services in reliance on the existing, unrestricted transfer framework.

110. Defendant benefitted significantly from withholding the information. Defendant would prevent Plaintiff from acting to secure shares that could be sold, creating a

significant economic barrier that would discourage employees or consultants from leaving the company. Because there is only 90 days to come up with the money after you separate from the company, the inability to sell shares can have a coercive effect on optionholders, forcing them to stay with the company or risk losing their equity altogether.

111. Defendant derived a further benefit from the concealment, which evidences its intent. By blocking transfers, Defendant ensured that optionholders could not sell their shares, and an optionholder who cannot sell cannot fund a cashless exercise from the sale proceeds, making it difficult to acquire shares. Coupled with the limited post-termination exercise period, during which an optionholder has only a short window to pay the full exercise cost out of pocket or forfeit the equity, the inability to sell makes exercise far less likely to occur at all. Because options that are never exercised never become issued shares, Defendant's suppression of secondary sales produced a dilution-avoidance effect that served Defendant's and its insiders' interests. That Defendant stood to gain from suppressing the information, rather than from disclosing it, further demonstrates that the concealment was deliberate. Insiders stood to make their shares more valuable by withholding information about the bylaws amendment, thereby making it difficult or, in some cases, impossible for employees and consultants to acquire their shares.

112. Plaintiff justifiably relied on Defendant's silence and on the pre-existing transfer framework. Had Defendant disclosed the pending or enacted restriction, Plaintiff would have exercised his vested options before the amendment took effect and thereby preserved his ability to sell his shares without the Company's consent. In reliance on Defendant's nondisclosure, Plaintiff forbore from exercising, to his detriment.

113. Because Plaintiff's engagement was terminable at will, Defendant knew that Plaintiff was free to leave at any time. By withholding that a pending bylaws amendment was to be implemented, it surreptitiously imposed a restriction that would make exercising the options difficult, and force Plaintiff into a posture in which he had to choose between continuing his engagement with the Company to preserve the value of his equity or departing and risking the loss of that equity, the precise coercive lock-in that disclosure would have allowed him to avoid.

114. In the alternative, to the extent Defendant did not act with intent, Defendant negligently failed to disclose material facts it was bound by operation of law to disclose, without reasonable grounds for believing that nondisclosure was proper.

115. As a direct and proximate result of Defendant's concealment and nondisclosure, Plaintiff suffered damages, including the loss of the opportunity to exercise and monetize his equity free of the consent requirement, in an amount to be proven at trial.

116. Defendant's intentional concealment and suppression of material facts, as alleged above, was despicable conduct undertaken with the intent to deprive Plaintiff of property and legal rights and in conscious disregard of those rights, constituting fraud, oppression, and malice within the meaning of Civil Code section 3294. The secret imposition of the restriction, the exemption of the very insiders who adopted it, and its selective enforcement against Plaintiff were committed, authorized, or ratified by one or more of Defendant's officers, directors, or managing agents. This allegation is directed solely to Defendant's intentional concealment and not to the alternative negligence theory pleaded above.

**EIGHTH CAUSE OF ACTION**

**Breach of Contract (Pled in the Alternative)**

117. Plaintiff incorporates all prior allegations.

118. In the alternative, Defendant was contractually obligated to apply transfer restrictions consistently.

119. Defendant breached that obligation by permitting comparable transactions while blocking Plaintiff's.

120. Plaintiff suffered damages.

**NINTH CAUSE OF ACTION**

**Declaratory Relief**

121. Plaintiff incorporates all prior allegations.

122. An actual controversy has arisen between Plaintiff and Defendant concerning their respective rights and obligations with respect to Plaintiff's proposed transfer. Plaintiff contends that, as applied to him and his proposed transaction, Defendant's refusal to permit the transfer, while permitting a materially identical transfer involving the same buyer for a favored holder, was wrongful and inconsistent with Defendant's representations and conduct. Defendant disputes that contention. The controversy concerns Plaintiff's own rights in the specific transaction at issue and does not seek to adjudicate the validity of Defendant's bylaws.

123. Plaintiff seeks a judicial declaration of his rights as against Defendant with respect to the proposed transfer at issue, including a declaration that Defendant's selective refusal to permit Plaintiff's transfer, while permitting a materially identical transfer for a favored holder, was wrongful as to Plaintiff and that Plaintiff is entitled to the benefit he was denied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests:

1. General damages
2. Special damages
3. Restitution
4. Disgorgement
5. Injunctive relief
6. Declaratory relief
7. Attorneys' fees, where permitted
8. Costs
9. Prejudgment interest as permitted by law
10. Punitive and exemplary damages, including according to proof pursuant to Civil Code section 3294
11. Such other relief as the Court deems just and proper

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

DATED: June 25, 2026

Respectfully submitted,

Patrick M Wallen

Patrick Wallen, Esq.

SSN 297707
Wallen Law PC
Attorneys for Plaintiff Mark Swendsen